Good morning. Each side will have 15 minutes and then 5 minutes in further argument for the appellant. And we ask that you speak up so that we're able to hear you. And you may proceed. Good morning and may it please the court. My name is Meredith Barron from the Office of the State Appellate Defender. Here today on behalf of my client, Guillermo Dominguez. This morning I will be focusing on the first issue that we raise in our briefs, which is that the state failed to prove Mr. Dominguez guilty beyond a reasonable doubt of involuntary manslaughter. More specifically, in this case the trial court's decision relied on legal and factual conclusions that were inconsistent with the evidence introduced at trial. First, at the very heart of the trial court's ruling was a finding that Mr. Dominguez was responsible for his son Guillermo Jr.'s injuries because Guillermo was in Dominguez's exclusive control during a period of time when his injuries were sustained. But that finding goes against the testimony of the state's very own medical witness, Dr. Suleman, who treated Guillermo back on December 13, 2002. According to Dr. Suleman, he testified that in the majority of cases, significance of dermal hematomas, like Guillermo's, start showing symptoms within 12 hours after developing. So in other words, signs of distress do not necessarily appear immediately after an injury has been inflicted, but may actually arise at a later time. So focusing on the time issue, this 12-hour window, upon which the doctors disagree, don't we still have enough circumstantial evidence pointing at Guillermo as the cause for his son's death? We do not. And that's sufficient under the case law? We do not. The only evidence that was used against Mr. Dominguez was the timing element, which I would disagree. There was no—nobody contested this 12-hour window. In this case, there was nobody saying that that lucid interval wasn't something that could exist. So we only have a 12-hour timing issue. That's the only thing that we have. And that timing was what was used to say that since he was home alone with his son, he must have been responsible. Didn't his wife testify the child was okay when she left for work? She did. But again, he could have been okay when she left for work because that was within that 12-hour period. But that could be made out of green sheets too, but it isn't. So what could be or couldn't be is not necessarily—is there any evidence that this child was injured before the woman left for work? There is the exact same amount of evidence that he was injured before she left for work as there was that he was injured after. Well, she testified he was okay when she left for work. She testified— There was no one who testified he was injured when she left for work. She actually testified that he was sleeping when she left for work, and sleeping does not equate with okay, and it's certainly not a medical diagnosis that— I think she testified he was okay. She said that he appeared fine to her. He appeared fine to her. But she's not a doctor, and she certainly didn't do any kind of examination of what he was like. And that still goes to this idea of a 12-hour period, which Dr. Sunderman testified— An individual can't testify that another person looks okay? An individual absolutely can, but saying that he's okay doesn't equate to saying that he hadn't yet been injured. And that's what we're talking about here. Let's talk about this time period. So the paramedics arrive at about 1220 or so, is that correct? Mm-hmm. So 12 hours before that would have been midnight, correct? There's some testimony that the father, the defendant, fed the baby about midnight. And then we have the mother leaving about 630, so the time frame starts to get smaller and smaller. I wouldn't actually say it gets smaller and smaller. You still have from midnight to 630, and we don't have any testimony as to what happened. Similarly, just like we don't have any testimony as to any injury that anyone inflicted on this child, there's no testimony that at any point in that 12-hour period, anybody did something to him that could have caused the injuries he sustained. And Dr. Suleiman testifying to this 12-hour window was the only testimony we have about this period of time, and it shows that under medical science, his injury could have been sustained at midnight. And Maria was home, Guillermo's mother, Mr. Dominguez's wife. Maria was home from 7 p.m. until 630 that morning, which means because she was home with them during this 12-hour period, this critical period before his symptoms manifested, she was equally as likely to be the cause of his injuries as Dominguez, which means that contrary to the trial court's ruling, Mr. Dominguez was not in the exclusive control of Guillermo at the period of time when his injuries could have been sustained, which means that, to put it another way... He was at least in the child's control for at least six hours. It would have been for about five and a half hours, but again, I think the problem is that this period of time is a broad period of time, and whether or not he was in control in some part of this time, there was somebody else there, and we can't guess which period of time it may have been during this 12-hour window that somebody could have been causing these injuries. Based on this 12-hour window, knowing both parents were home, it's really just nothing more than guessing which parent would have been responsible. And when you look at the exclusive control idea, it shows that the trial court based its decision under a flawed idea of the evidence. The trial court, thinking it was exclusive control, equates to an old notion of shaken baby syndrome, which is that the person present when the baby shows symptoms equates to being the person who's guilty. Who says that? Well, that is in other case law discussing shaken baby syndrome as being part of the signs of the past of shaken baby syndrome. What we now know and what experts have tested. Wait a minute. How do we know that? You've got a whole section of your brief here, not a cent of it was ever presented to the trial court. As far as talking about the shaken baby syndrome articles? Yes. It was not presented to the trial court. How does that get into our briefs? How does that get into even consideration in this case at this juncture of the case? Under Marburg, these articles that I presented are actually not expert opinions. These are not something that was not known at the time. These are just more opinions to help the court form its decision. The court has to form its decision based on an issue that's properly before it. Did you ever raise, was it ever raised before the trial court, that there was ineffective assistance on the part of the trial counsel for not asking for a fry hearing or raising the issue before the trial court that the SDS testimony was incompetent under present medical opinion? Well, it wasn't, which is why I phrased it as ineffective assistance. Counsel would have raised his own ineffective assistance. If there's ineffective assistance at counsel, rest on matters divorce the record. It belongs in a post-conviction petition, not in an underlying brief in a direct appeal. An important factor, though, is that even if you don't want to look at any of those articles, even if you don't want to discuss shaken baby syndrome, it doesn't change the outcome of this first issue of reasonable doubt. I'm not asking you about the first issue, ma'am. I'm asking you why your second issue is even in your brief. Because it was ineffective to not ask for a fry hearing. Why? Based on what? Based on the fact that a fry hearing has never been conducted on controversial science known throughout the medical field. It says it's controversial, and was that ever presented to the trial court? Yes. It was presented to the trial court? It was. Dr. John Paul Quayle, who is the baby's pediatrician, as well as all of the state's witnesses, acknowledged that there is diverse opinions as to the validity of this shaken baby syndrome. Shaken baby syndrome is not a methodology. It's a diagnosis. It's a conclusion. It's a conclusion, but it's formed based on a triad, which is a diagnostic checklist of three symptoms, cerebral edema, retinopathy. The other section you're saying it was ineffective assistance counsel not to ask for this fry hearing. By my reading of the record, there isn't a scintilla of evidence in this record that anyone ever raised an issue before the trial court as to all these articles that you present or ever presented evidence. This belonged in post-conviction. There was evidence in the trial court that controversial. Dr. John Paul Quayle specifically said that this is a controversial diagnosis in the medical community. It's a diagnosis. He never testified there was controversial methodology. These were doctors. They are doctors, which is why in cases like Cook we have the opinion that it was. Let me make it real simple for you, ma'am. A person breaks their arm, and the doctor looks at the arm and says, that's a broken arm. And the methodology is based upon the doctor's education and scientific ability. And the doctor makes a diagnosis, broken arm. You get a fry hearing on broken arm? No. The methodology is good. So now fry is methodology, and that's what Cook says. And Cook told you, this is not the basis of a fry hearing. But Cook was in 2014, and this case was a year earlier, when at the time there were three symptoms, cerebral edema, renal hemorrhaging, and subdural hematoma, which were used as a sort of checklist, a test, to say, you know what, we have these three symptoms, ergo we have shaken baby syndrome. And the idea that this test was given the validity in the court, this science that has been known to be disproportionate. It's not science. It's a conclusion. I mean, Cook took you chapter and verse down the line on this issue. The methodology is what you're entitled to test under fry, not conclusions, not diagnosis. It's methodology. And none of this has anything to do with the methodology in this case. The child had a subdural hematoma, didn't he? He did. Is there anything wrong with the methodology that was used in order to come to that diagnosis? To the diagnosis of him having a subdural hematoma, no. But to the diagnosis that there are three symptoms. That's not a diagnosis. That's a conclusion. Well, coming to the conclusion that he has a subdural hematoma is different than saying that when we have three different symptoms, it's a test. I think the conclusion is what caused the hematomas. I think perhaps what Justice Hoffman is going toward here, because that's what our case is about, is what caused the hematoma, which then caused the infant's death. Correct. Correct. And I understand that if you do not think that the articles were appropriate, that under my jurisdiction... Do I not think the articles are appropriate? I don't think the entire argument belonged in this brief. It belonged in a post-conviction hearing. If you want to raise the issue, even if you have an argument, it didn't belong there. But go ahead on your first issue. Well, even if we don't, we don't need to reach shaken baby syndrome in any form. Just looking at this first issue, that is the only issue that we need to focus on right now, because under that issue, ignoring shaken baby syndrome, there was no evidence that he didn't act which caused Guillermo's death. Going back to this 12-hour window, based on the testimony of the State's own witnesses, even if Guillermo had suffered from shaken baby syndrome, but we don't need to reach that right now, Dominguez was not the only person who could have been responsible. He just had the misfortune of being the only person home with his son when he lost consciousness. And any reliance on that unfortunate timing is nothing more than impermissible speculation which cannot be used to support his conviction. Now, the State would argue that this 12-hour window is effectively irrelevant because Mr. Dominguez provided a statement. A statement which, according to the State at least, in which he confessed to some kind of an aggressive behavior towards Guillermo. But that type of interpretation of the statement is nothing more than over-exaggeration and conjecture. Even assuming that Detective Martinez accurately testified to Mr. Dominguez's 11-year-old unrecorded oral statement, there's nothing in that statement that's incriminating. Mr. Dominguez did not admit to any type of abuse or injury or aggressive behavior towards his son. The only thing that Mr. Dominguez described in his statement was burping his baby in a way that accidentally caused Guillermo's head to jerk forward into his head and chest. What did Dr. Jones say about that? And Dr. Jones actually specifically said that that type of action, the action described in that statement, was not sufficient, could not have caused the injuries that Guillermo sustained. And in fact, she specifically said that the, excuse me, one second please. Such injuries require force that is far beyond anything that would be used on a child in normal child rearing. And here, Dominguez's statement details nothing more than a minor accident while trying to burp his newborn, which is a normal part of tending to a newborn. And as even the trial court noted, there was no credible testimony that Mr. Dominguez was anything other than a loving and caring father. Now, weren't there some differences between the defendant's own testimony and Detective Martinez's recitation of his so-called confession from 11 years ago? There were differences between what they said. It was 11 years earlier. There is an 11-year gap here that I think contributes to any disagreement. There was also, Mr. Dominguez, the detective translated what Mr. Dominguez was saying. Mr. Dominguez at trial said that he didn't testify to the actual hitting behavior. He didn't say that he didn't burp his child. He said he didn't testify to the specific exact way he was demonstrating burping his son, which I think is attestable to the 11-year difference. And again, though, even if we were to take Detective Martinez's testimony at its word, that statement doesn't say anything that could have caused Guillermo's injuries. Now, the trial court did find that Mr. Dominguez minimized the shaking in that statement, but the trial court reached that finding by examining the statement through the erroneous lens of exclusive control. If, as the trial court mistakenly believed, Mr. Dominguez had to be guilty simply by virtue of having been home alone with his son when he lost his consciousness, then it does in some ways logically make sense that he did not describe something that had happened. But in truth, as Dr. Suleman, the state's own witness, testified, Guillermo could have sustained those injuries many hours earlier when they were not home alone together. And in that light, any finding that Mr. Dominguez minimized the extent of his actions is nothing more than an uncorroborated guess, which cannot be used to support his conviction. Was there any notes produced that Detective Martinez said he made notes about the statement? There was nothing about the statement. He said that he was going to go back, he was going to go back after and write up a supplemental report, but he never had time. Other cases got in the way, there were other things that happened, and then just a few months later he was transferred from Chicago Heights to the new Lenox Police Department. So there was, he said that there should have been notes that should have been in his file, but nobody ever found them. So there were no real notes, there was no report. The trial court specifically found Martinez credible, didn't they? He did. And we can find him credible because based on what he said, his testimony was about an accident, hurting his son, which Dr. Jones specifically said could not have caused the injuries that were sustained. In closing, the trial court's ruling demonstrates that it overlooked critical evidence presented by the state's own witnesses when finding Guillermo Dominguez guilty of involuntary manslaughter. Dominguez may have been the only person home when his son's symptoms manifested, but that does not mean he was their cause. And since Murillo was home in the preceding 12 hours, there is certainly doubt as to who could have caused Guillermo's injuries.  And we again see that it tells nothing more than of a father burping his son and his son accidentally thumping him into his head and chest. Therefore, even viewing the evidence in the light most favorable to the prosecution, the state failed to prove beyond a reasonable doubt that Mr. Dominguez did an act which caused Guillermo's death and therefore failed to prove beyond a reasonable doubt that he is guilty of involuntary manslaughter. Therefore, for the reasons addressed in the briefs and discussed here today, we respectfully request that under Issue 1, you reverse Mr. Dominguez's conviction for involuntary manslaughter, or alternatively, pursuant to Issue 2, that you reverse the demand for a new trial. Thank you very much. May it please the Court, Assistant State's Attorney Gina DeVito, on behalf of the people of the state of Illinois. The facts here establish that a two-month-old baby suffered from catastrophic injuries that resulted in him being kept alive on life support in a vegetative state for 16 months. What did Mr. Dominguez do to this child? Mr. Dominguez, according to Dr. Jones, Dr. Sullivan and Dr. Tico, did not care for his child in a manner that was appropriate. What does that mean? What did he do to the boy? He caused traumatic brain injuries. How did he do that? That is unknown. We do not know exactly what happened. We do know that the trial judge found that he didn't do it intentionally. That is correct. So we've got him not doing the act intentionally, and we have him in exclusive possession of the child for about a six-hour period. We have the child taken to a hospital, and the child is found to have subdural hematomas and other injuries, and he's found guilty of manslaughter based on a reckless act. What was that act? His care of his child that caused a traumatic brain injury. Caring for a child is not an act. His act, the act that he… What did he do? He shook the baby or mistreated the baby. He acted in a manner that caused this child to suffer from traumatic brain injuries, Your Honor. Your Honor, you testified that no witness said, I saw him shake the baby, correct? Absolutely not, because… So we have to rely on what the doctors have concluded. Correct. But then we still have the problem with who had the kid during what period of time? Your Honor, I would respectfully argue that there was no problem with the period of time, and that is because the testimony at trial established that the baby was in his sole care and custody for the 12 hours preceding his injury. The baby's own mother testified that although she was asleep in the home at midnight, the defendant was the person who got up and fed the baby in the middle of the night, and she did not care for the baby the rest of the evening and that morning. And defendant was the sole caretaker of the child for that remaining period of time. During that period of time, was the mother somehow barred from access to the baby? We have testimony from the mother saying she checked on the baby. That is correct, that that was the testimony, and the evidence at trial showed that she did not lay hands on the baby or touch the baby in any manner or care for the baby during that time. I'm not sure it's correct because the mother testified about the state, among other things, the state of the baby's eyes. That was prior to putting the baby to bed, Your Honor. She had stated that the baby had been fussy and his eyes were swollen, and it could be inferred from that that perhaps the baby was getting a cold and was fussy. Could it be inferred from that that this whole chain of medical events occurred before the father, before the mother left the house? No, Your Honor, and that is because the evidence at trial established by the prosecutor's three doctors that this injury occurred within 12 hours of the 9-1-1 event. You're losing me on the argument that just because an injury occurred, he's guilty of involuntary manslaughter. I mean, what would happen if a person picked up their child and for some reason tripped and the child's head hit a wall and he suffered a subdural hematoma? Is that involuntary manslaughter to you? No, Your Honor. Then what did this man do? This man gave inconsistent statements about what occurred the day that this child suffered a catastrophic brain injury. This man stated to police initially when he was questioned by Detective Martinez He picked up the child, the child's head hit his chest and hit his head. Dr. Jones says that couldn't cause a subdural hematoma. Well, actually, Your Honor, initially he didn't even testify to that. Initially he testified, he, excuse me, told Detective Martinez that nothing had happened and that he just saw the baby choking. When the detective confronted him and said I know what happened. Okay. So why does that equate to the commission of an act that was reckless? We don't have an act. We have nobody testifying that this child, that this defendant committed some act that could be called reckless. This defendant's testimony, excuse me, statement to the detective that the trial court found reliable was that the baby was held in a manner we cannot see from the record what he is talking about a splattering effect when he held up the baby. He demonstrated for the trial court that he had his arms straight out and that he held up the baby and the baby's head hit his head and his chest and the baby went back and forth in a splattering manner. Dr. Jones testified that that action could not cause the injuries of this child. And what Dr. Jones' point was is that this injury could not be caused by, it is a non-accidental trauma. Oh, no, no, no. That's not what Dr. Jones said at all. What Dr. Jones said is picking up a baby and having the baby's head move back and forth, striking a head or chest is insufficient to cause the injuries the child suffered. The child would have had to have been banged against something, which she didn't say he was, because there were no outward signs of trauma. So that's all that Dr. Jones did was discount the statement that he allegedly gave to Detective Martinez as being the cause of the child's injuries. That's all Dr. Jones did. She didn't testify to anything else other than the injuries he actually had. Dr. Jones stated, Your Honor, that the type of force that was needed to cause this injury was equated to a car coming down on an adult. A traffic accident with rotation, fall from height, most commonly due to head trauma. We do not have any testimony here that anything other than what defendants stated to Detective Martinez and at trial occurred to this baby. This baby was injured catastrophically with a severe brain injury. Don't we have some medical testimony to the contrary that it's not, that these types of injuries don't always occur because of shaken baby syndrome? It could be due to anemia or some other factors? That's correct, Your Honor, that that was brought up by defense counsel, and that was tested by the three doctors the prosecution put on here, and they found that that was not the case here. Well, your doctors didn't believe it was the case, but wasn't there a defendant's doctor who said there are other ways this happens other than people shaking babies? That's correct. However, all three of those doctors were discredited on cross-examination as not having examined this child or viewed any of the medical records for this child. So I would argue that their arguments were not reliable. What is the definition of a reckless act? You know? I would rather have you tell me what reckless is. Conscious disregard of an unjustified or substantial risk of harm. And I'm back to the question. What did he do that was in conscious disregard and a substantial and unjustified risk of harm? Or what did the state prove he did? What the state proved was the child was okay when the mother left at 630, and six hours later the child had subdural hematomas, and he was home alone with his father. That's what the state proved. And, therefore, we can conclude, therefore, that the father committed a reckless act that caused subdural hematoma. That's your case, right? I mean, narrowed down it would be our case. However, you're leaving out that the defendant gave inconsistent statements about what occurred. He is not going to come in, perhaps, and tell everybody exactly what he did to this baby, but he was the sole caretaker of this baby for the 12 hours preceding the injury. I'm so sorry. It did happen. Excuse me. Absent the inconsistent statements, the state would concede that they had no case against this man? Absolutely not. No? Well, what would you have? He was the sole caretaker for 12 hours. I think in Latin that's known as post folcare pro caro. After this, therefore, because of this, it was fallacious logic in the time of Aristotle, and it's fallacious logic now. That the defendant was the sole caretaker of the baby? No, no, no. Because he was the sole caretaker of the baby, therefore he committed a criminal act that caused the injury. That doesn't necessarily follow. A million things could have happened to that child in the six hours. He could have fallen. He could have been dropped. He could have done a lot of things. Your Honor, he did not state what in the numerous occasions he was given opportunities to say that he had dropped a baby, that the baby had fallen. This is a two-month-old baby that is being cared for by a defendant. And he never stated anything other than his insane statements that when he heard the baby choking when he was in the kitchen, he then ran down to get the landlady and then a neighbor who had to come upstairs and tell him to call an ambulance. Martinez testified to this business of picking up the child, attempting to burp it. His head hits his chest. It hits his head. The trial judge says that he feels that his statement to Martinez minimizing the shaking was more accurate than the testimony that he gave on the stand. So assume for a minute that in picking up the child, the child moved a lot harder than he said Detective Martinez. Is that still a reckless act? Yes, Your Honor. Why? Because he did not use proper care for a two-month-old child. And don't two-month-old children squirm all the time and not necessarily follow your instruction and move around in an unpredictable manner? I mean, that's what this seems to be. But even if that is what it seems to be, people raise two-month-old children all the time that squirm around, and if they improperly burp them, they do not suffer from traumatic brain injuries. But kids are injured all the time while in the custody of their parents, and their parents aren't necessarily guilty of conscious disregard or substantial and not just risk of harm. When they cause a traumatic brain injury, that we have three doctors here who are experts on the field. We know the child had a traumatic brain injury. We know that. But you've got to prove more than that to find him guilty. You've got to prove that he committed a reckless act. And defendant did commit a reckless act where he was with the baby for the 12 hours preceding the injury, and he was the sole caretaker of the baby. So we don't need evidence of what the actual act was? The evidence was stated by the trial court. The trial court found that defendant's statements and his testimony was not credible, and he was the sole caretaker, where Detective Martinez was found to be a credible witness. And so, yes, of course, we look at all the evidence and the totality of the evidence, including the medical evidence, the testimony at trial by numerous witnesses, established for the trier effect below that defendant was guilty of involuntary manslaughter, not murder. He is reducing from murder to involuntary manslaughter, his actions while he was in the sole custody. I think the case law allows us to infer intent from the circumstances and from the medical evidence. So based on the fact that we have a very young baby and had these traumatic injuries, that whatever act it was, there would be enough evidence to infer the proper intent or the recklessness. But can we infer that the defendant, from that evidence, can we infer that the defendant did more than he did when he talked about what happened when he was birthed? Absolutely, Your Honor. And how can we do that? Because he suffered, the baby suffered, from a traumatic brain injury that was testified to by the doctor, especially Dr. Jones, that the type of force required to cause the injuries he was saying  in normal child rearing. And that's in quotes. So are we to say that the injury occurred at the time he birthed or he was trying to birth the child, that something more happened? Something more happened, Your Honor, yes. Before your time runs out, let me jump over to the F.R.I. issue very briefly. Okay. Ms. DeVito, let's say tomorrow the American Medical Association gets the Nobel Prize for Medicine for discovering that everything we've assumed about shaken baby syndrome was invalid. It's like the old test that used to say that somebody committed a crime because of a hair found at the scene of a crime, which we know now is meaningless. Where does that leave our defendant? What's his remedy? Post-conviction, Your Honor, because then it would be newer novel evidence that he would be able to bring to a post-conviction court. So that being your answer, do you agree with sort of the premise of Justice Hoffman's question to opposing counsel that it's not appropriate to raise that issue at this stage, even though we may have it all before us that this is a controversial issue that's evolving? Yes, I do agree that it is not the appropriate place for it, but I also do not feel that any of the evidence presented is newer novel here, even with the fact that Cook was decided the day after this case went to trial. There are numerous cases, including Armstrong, that go into the alleged controversy about shaken baby syndrome. Is there any evidence in this record that the diagnosis of shaken baby syndrome was called into question with evidence that it is no longer a valid medical diagnosis? Well, all three of the prosecution's witnesses did not. That wasn't my question. My question was, is there any evidence in this record that anyone called into question the diagnosis of shaken baby syndrome based on it's no longer being a valid medical diagnosis? Anyone testify to that? Well, Dr. Cueva, the victim's pediatrician, did testify to that and was cross-examined on that. Okay. Now, is shaken baby syndrome a methodology? It is a scientific conclusion. But is it a methodology? I would say no. And what is the purpose of a FRY hearing? The FRY hearing is to determine if scientific evidence is admissible at trial, if the principle upon which the opinion is based is sufficiently established to have gained general acceptance. I think it's the underlying methodology of the opinion, not the ultimate conclusion, which is supposed to be the subject of a FRY hearing. Well, and as you know, Your Honor, all three of the prosecution's doctors testified that shaken baby was consistent with their finding. That's not the issue. The issue is, was any methodology that was testified to as the injury suffered by this child called into question? No. If you have no further questions, Your Honor, the people have asked that you affirm the conviction for involuntary manslaughter. Thank you, Counsel. Ms. Barron, before you even start rushing to what you were going to say, let me ask you to answer Justice Hoffman's last question. You know, was there any methodology that reached this conclusion that was called into question that is shown in the trial record? The methodology leading towards shaken baby syndrome? The methodology is the triad. The methodology is the diagno- Hold on one second. Is shaken baby syndrome a condition? It is a medical diagnosis. Is it a condition? I wouldn't consider it to be a condition. No. Was there any evidence in this record that called into question the methodology of the conditions from which this child suffered, i.e., subdural hematoma? Could you repeat the question? I'm sorry. Is there any evidence in this record that called into question the methodology that led to the conclusion that this child suffered subdural hematoma? There was no specific evidence that there was a controversy about the triad, but there was absolutely testimony about the triad. In fact, every single one of the state's three medical witnesses said specifically these were the three things we looked at. These were the three things we found. You didn't yet, but you won't answer my question, will you? I asked you and I will ask you again. Is there any evidence in this record that called into question the methodology that was used by these doctors to conclude that this child had a subdural hematoma? No. Okay. So now what you're arguing is that what's erroneous is the conclusion that they reached that the cause of the subdural hematoma was shaken baby syndrome. Is that what you're arguing? Yes. Okay. Is shaken baby syndrome a methodology or a conclusion that's arrived at from a  It's a conclusion that has arrived at from a methodology. And does FRI address conclusions or do FRI hearings address only methodology? FRI addresses methodology, but the methodology that leads to the conclusion, this triad idea, that is what is the part of shaken baby syndrome as a general term that needs to be tested, the idea that the methodology of this triad test leading automatically to shaken baby syndrome. The only thing I'd like to say today, counsel repeatedly said that despite everything during that 12-hour period, Guillermo was in the sole care, the exclusive control of Mr. Dominguez. And that's simply not true, not true based on the record at all. From midnight until 6.30 that morning, Maria was home with her family. Nothing prevented her from being near her son. There was no testimony as to what happened from midnight to 6.30. We just don't know what happened, and she was certainly present. And Mr. Dominguez was not the sole caretaker of his son during the preceding 12 hours before his symptoms manifested. Thank you very much. Thank you. We will take the case under advisement.